### J. W. ZEMPTER CONST. CO., Inc., v. RODGERS.

### No. 3711.

Court of Civil Appeals of Texas. Amarillo.
Jan. 13, 1932.

Monning & Akin, of Amarillo, for appellant.

Vickers & Campbell, of Lubbock, for appellee.

HALL, C. J.

Rodgers sued the appellant Zempter Company and the Panhandle & Santa Fé Railway Company, to recover $600 damages to his Chevrolet truck, which he alleges collided with a passenger train. That the collision was proximately caused by the negligence of the Zempter Company in not maintaining a flagman at the crossing to advise appellee and other truckmen of the approach of fast-moving passenger trains. That his damages were also proximately caused by the negligence of the railway company in approaching the crossing without having its train under control and at a rate of speed exceeding sixty miles per hour and in failing to blow the whistle and ring the bell, and further in failing to slow down the train upon discovering appellee's perilous situation.

It appears that the Zempter Company, as contractor, was paving state highway No. 7 between Lubbock and Slaton. That said highway runs parallel with and on the south side of the line of railway between said stations. That in doing said paving Burrus Switch on the railway was the appellant's base of supplies, consisting of sand, gravel, and cement delivered by the railway company at that point. It appears that the Zempter Company had about 100 men assisting it in doing the paving. That sand and gravel were unloaded from the railway cars standing on a switch into a hopper on the right of way, and that the cement used in paving was left in the cars standing on the switch track. That the cement mixer was moved along the highway as the work progressed. That the Zempter Company had a loading cane at the hopper and had constructed a roadway over the railroad tracks for use by appellee and other truck drivers engaged in hauling material from the switch track to where the paving was being done upon the highway. That the Zempter Company had employees working at the hopper loading sand and gravel into the several trucks, and its employees also loaded cement from the cars into the trucks with sand and gravel. That it had employees keeping the road in repair for the use of the truckmen and had had a flagman to warn truckmen of the approach of trains. That such flagman had been kept by the Zempter Company at the Posey Switch, a previous base of supplies, but for some reason was not on the job at the Burrus Switch at the time of

the accident. That in hauling supplies from the switch track for use in paving the highway, it was necessary for truckmen to drive across the railroad track at the switch.

The Zempter Company alleged that appellee was not one of its servants, but was an independent contractor. That it furnished a safe place for him to work, that appellee was guilty of contributory negligence proximately causing the collision, and that plaintiff had assumed the risk incident to such employment.

The railway company also alleged contributory negligence on the part of appellee and, by way of cross-action, interpleaded the Connell Chevrolet Company, alleging that it was claiming some sort of a lien upon or right, title, and interest in and to the damaged truck.

The Connell Company, by cross-action, set up that it had a valid subsisting chattel mortgage on the damaged truck to secure the unpaid balance of the purchase money amounting to $379.07, evidenced by a note executed in its favor by appellee.

At the time of the accident, the appellee's truck was loaded with sand and gravel from the hopper and with several sacks of cement, and was crossing the railroad track onto the highway when the rapidly approaching train collided with his truck, causing the alleged damages.

In response to the special issues, the jury found: (1) That in the exercise of ordinary care the agents of the Zempter Company should have kept a flagman at the crossing to warn appellee and other truckmen of the approach of trains on the occasion of the collision; (2) that the failure to keep a flagman at that time was a proximate cause of the collision; (3) that the employees of the railway company were not negligent in approaching the crossing at the rate of speed testified to by the witnesses; (5) that $400, if paid now, will compensate the appellee for the damages sustained; (6) that appellee was not guilty of any negligence in attempting to drive his truck onto and across the railroad track at the time of the accident; and (7) that he exercised ordinary care to discover the approach of the passenger train and avoid the collision.

Judgment was entered discharging the railway company and against the Zempter Company in the sum of $400, and it appearing that the Connell Company had been paid in full before the judgment was entered, its action was dismissed.

It is first contended by the appellant that the court should have directed a verdict in its favor because the uncontroverted evidence showed as a matter of law that Rodgers was an independent contractor and not a servant of appellant, and that therefore appellant owed him no duty to furnish a safe place in which to work.

The pleadings are sufficient to raise the issue of the relation existing between Rodgers and the Zempter Company.

Rodgers testified that he commenced to work for the Zempter Company May 15, 1930, at Slaton, where the company commenced to pave highway No. 7 toward Lubbock. That his work consisted in hauling sand, gravel, and cement. He explained that this material was shipped over the railway and unloaded at the base of supplies into a hopper, in which was placed certain amounts of sand, gravel, and cement. That he furnished his own truck and was paid 25 cents for hauling each load the first quarter of a mile, and a stipulated price for each additional quarter of a mile in going from the base of supplies to where the paving was being done. That there were other truckmen doing similar work. That the distance which he had to travel in order to get the material from the cars to the place where the work was being done upon the highway varied. That on the day of the accident the crane where the sand and gravel were loaded was about 1,500 feet west of the private crossing. That the sand was loaded onto the truck with a scale hopper which weighed the material; then six sacks of cement were placed on top of that load. From there the truckmen drove across the railway track to the highway, where they were directed to unload it. That on the day of the accident there were about eighteen truckmen engaged in hauling material. That the Zempter Company gave each truckman a ticket for each load and the tickets were turned in every afternoon when they quit hauling. That they were not required to haul any certain number of loads, as that was up to the truckmen. That they had definite hours and were supposed to work ten hours. That after working eight hours if they had private business they could ordinarily quit and attend to other business. He further testified that he furnished gasoline, oil, tires, etc., for his own truck. That the truckmen were not instructed how fast to go, but were authorized to keep gravel, sand, and cement at the mixer so it would not be necessary to employ more trucks. He further testified: "All they did was to tell us where to get it (the material) and haul it to. If I had run my truck without sufficient oil, that was none of their business. If there was no water, there was no kick, and it was no matter of theirs if it had flat tires. I was in full charge of myself and car. The truckmen did not haul the same number of loads every day and on the day of the accident I had not worked during the morning. I was carried on the Zempter pay-roll and was paid off every two weeks on Saturday. My pay was different amounts according to the amount hauled. The size of our checks depended on how much we hauled—just how much time we wanted to put in. Some days I would not come at all, not until they would

lay me off. There were so many trucks, then there were several new men. They brought men from Amarillo that had been with them beforehand and they would let them work and lay us off. When crowded they would lay men off and give old men advantage of working on. As the grade was being fixed that morning I did not work. I had hauled seven loads that day and was on the eighth. My contract was that they would let me haul as long as there was anything to haul. There was no kick if I did not get there at starting time. If I wanted to quit work a few minutes early at lunch time, I would see it was agreeable before I would quit. I could have gone on any job I pleased at that time. They did not tell me to take a certain route for I knew there was only one."

J. R. Newland, who represented the Zempter Company in the matter of having sand and gravel and other materials hauled, testified that he made the contract with appellee Rodgers for hauling and paid him 25 cents per load for the first quarter of a mile and 4 cents for each additional quarter of a mile necessary to be traveled in hauling and delivering the load. That he was not carried on the regular pay roll but on a separate pay roll. That the mixer was run eleven or twelve hours per day. That some of the truckmen did not work regularly and they varied as to the amount of time they worked. That the company was interested in getting the material to the mixer to keep it from being shut down. That the truckmen furnished their own equipment and selected their own route. That he gave no instructions except as to what material to haul and where to haul it. That a ticket was issued to each truckman at the mixer. That the truckmen were paid by the load whatever price the load was and the number of loads. That he did not require the appellee to work exclusively for the Zempter Company during that time. That there was no workmen's compensation policy protecting Mr. Rodgers. That the company raised no kick if any of the truckmen were not there at opening time and that they did not supervise the hauling. That if any truckman wanted any pay, it was up to him whether he worked or not and they paid him according to the number of loads he hauled.

It appears from this testimony that under the appellee's employment it was his duty to haul whatever material was delivered to him by the appellant's servants at the base of supplies and to deliver it wherever the servants directed. To this extent he was under their control. He admits that the appellant company had the right to terminate his employment in favor of older employees and at the company's option and that he had no right to haul material except when requested to do so.

It is said in 39 C. J. 1322, § 1525: "The fact that under the terms of the contract the employer may discharge the employee at any time or upon the happening of certain contingencies, is a matter to be considered in determining whether or not an employee is an independent contractor or merely a servant, and in a doubtful case may become an important circumstance."

In 14 R. C. L. 72, § 9, it is said: "The power of an employer to terminate the employment at any time is incompatible with the full control of the work which is usually enjoyed by an independent contractor and hence is considered as a strong circumstance tending to show the subserviency of an employee. Indeed, it has been said that no single fact is more conclusive, perhaps, than the unrestricted right of the employer to end the particular service whenever he chooses without regard to the final result of the work itself."

In discussing the mode and time of payment, the said authority, pages 74, 75, § 11, says: "On the other hand, the fact that a person is paid by the piece or by the job, though indicating that he is an independent contractor, is not conclusive on the question, and he may, nevertheless, be held to be a servant. Particularly is this so when there is no definite amount of work to be done, but either party is at liberty to terminate the employment whenever he wishes and the employee receives pay for just the amount of work done."

See also In re Dobson, 124 Me. 305, 128 A. 401, 42 A. L. R. 603, and notes on pages 616 and 619; 43 A. L. R. 1316.

The rule announced in these authorities has been approved in West Lumber Co. v. Smith (Tex. Civ. App.) 283 S. W. 1104, and in Texas Employers' Insurance Association v. Owen (Tex. Com. App.) 298 S. W. 542, 543. In that case it was insisted that the court should have directed a verdict and erred in submitting the issue whether or not the deceased was an employee of the McKnight Company at the time of the accident. There the party who it is claimed was an independent contractor, furnished his own truck for hauling gravel. The court said: "There is lacking here the indispensable feature of an 'undertaking to do a specific piece of work.' There was not contemplated any completed job. It was a mere service at the will of the parties."

The language there used is applicable here. The Zempter Company was engaged in paving a state highway. The material being hauled by the railway company for use in doing the work was delivered at different unloading switches, which were changed as the work progressed. The appellee had not undertaken to do a specific piece of work, but was employed to haul the material from whatever base of supplies his employer might direct and deliver it at any place upon the highway which his employer designated. He was not employed to work until the job of paving had been com-

pleted, but admits that he had been and could be discharged at the will of his employer and that he could refuse or fail to do any hauling without violating any obligation.

We are cited to the case of Southern Surety Co. v. Shoemake (Tex. Com. App.) 24 S.W.(2d) 7. In that case the complaining party was employed to haul gravel for use in completing a hotel then under construction and was told "that the job would last from 10 to 15 days." Under such contract his employer clearly had no right to discharge him until the hotel had been completed, which both parties contemplated would be done in not less than ten nor more than fifteen days. The Shoemake Case is not authority here.

Under this evidence the court would have erred in holding as a matter of law that Rodgers was either an independent contractor or a servant and in directing a verdict in accordance with such holding.

■ It follows from what we have said that the court erred in not submitting the appellant's special issue inquiring whether plaintiff was an employee of the Zempter Company. Under the evidence it was clearly an issue of fact for the jury.

■ Under the fourth and fifth propositions, appellant asserts that the court erred in failing to submit issues based upon its defenses of assumed risk and contributory negligence.

We sustain these propositions. The case seems to have been tried in the court below upon the mistaken theory that the Workmen's Compensation Law was applicable. Rodgers makes no claim for personal injuries. The damages sued for resulted solely to his Chevrolet truck. The Workmen's Compensation Law, which is R. S. title 130, is a special act designed to take the place of actions for damages for personal injuries under the common law. Section 1 of the article 8306 provides that in actions to recover damages for personal injuries sustained by an employee in the course of his employment or for death resulting from personal injuries so sustained, the defenses of contributory negligence, negligence of a fellow servant, and assumed risk, are not available. Nowhere in the act is there any language which would indicate that the law applied where the suit was for damages to personal property.

The next and last contention is that the court erred in refusing to allow each of the defendants, the Zempter Company and the railway company, three separate peremptory challenges while selecting the jury.

■ The rights of the Zempter Company and the railway company were adverse in some particulars, but the verdict of the jury being in favor of the railway company and the judgment entered thereon having the effect of releasing the railway company from all liability to either party, and there being no appeal by either Rodgers or the Zempter Company from such judgment, the matters complained of by this assignment will have become moot and cannot arise upon another trial. It therefore becomes unnecessary for us to consider this assignment of error.

For the reason stated, the judgment is reversed and the cause is remanded.