**COMMERCIAL CREDIT CO., Inc., v.
GROSECLOSE.**

No. 2897.

Court of Civil Appeals of Texas. El Paso.
Nov. 29, 1933.

Rehearing Denied Dec. 21, 1933.

Touchstone, Wight, Gormley & Price, of Dallas, and Brown & Brooke, of El Paso, for appellant.

Henry T. Moore and R. L. Holliday, both of El Paso, for appellee.

HIGGINS, Justice.

Appellee, Groseclose, was a passenger in a Dodge car being driven by one A. E. Morrison from Los Angeles, Cal., to Dallas, Tex. A few miles east of El Paso the driver lost control of the car, resulting in a collision with a tree whereby appellee was injured. He brought this suit against appellant, Commercial Credit Company, to recover damages for the injuries sustained. Verdict was returned, and judgment rendered in his favor.

Appellant is a financing Texas corporation domiciled in Dallas. The record discloses that it deals extensively, if not exclusively, in so-called automobile paper and securities. A California corporation domiciled in Los Angeles bears the same name. Another corporation bearing the same name is incorporated under the laws of Arizona and domiciled at Phœnix.

The Perry Motor Company of Dallas had a mortgage upon the car mentioned securing the payment of certain notes of J. B. Gray, the owner of the car. The motor company transferred the notes and mortgage to appellant. The motor company guaranteed the payment of the notes. The car was taken by its owner to California. In the telegrams later quoted and throughout the record the car is usually referred to as the Gray car. Gray defaulted in his obligations, and, upon instructions from appellant, the California corporation repossessed the car and had the same in a garage at Los Angeles. The Perry Motor Company had previously directed appellant to repossess the car. At the same time the California corporation had in its possession two other cars in which appellant seems to have had some interest. The other two cars are referred to as the Owen Cates car and the Walter Spears car.

One John B. Myers was the claims manager of the California corporation.

The driver, Morrison, testified that for about two years prior to August, 1931, he had been engaged in transporting repossessed cars for finance companies. He called up Myers on August 5th and inquired if he had any cars moving. Myers stated he had some cars belonging to the Texas office, but was not sure whether or not they were going back; that he would call Morrison as soon as he shot a wire through to find out. On the same date telegrams passed between the California corporation and appellant as follows:

The California corporation to appellant: "Gray Dodge repossessed advise disposition."

Appellant to the California corporation: "Retel Gray Dodge endeavor sell two hundred fifty dollars or advise best bid obtainable Stop Nice work on this claim Stop Have you been able secure better bid Owen Cates and are there any new developments Walter Spears Stop Thanks again please answer by mail."

The California corporation to appellant:

"Cannot get five hundred twenty five dollars for Spears repossession no better bid on Owen Cates car have man to return both for thirty dollars each better return them."

Appellant to the California corporation:

"If your wire regarding Walter Spears and Owen Cates means you can get cars to Dallas for thirty dollars apiece with no other expenses added send them back also send the Gray car back Stop We understand ninety dollars is all expense involved in getting three cars to Dallas advise."

Morrison testified further:

On the morning of August 6th, Myers called him up and said the cars were going back and to come over to the office. Morrison did so, and Myers said he had three cars going back to Texas; that Myers said: "'These cars will have to be chiseled through, we cannot advance any money here on them,' he says 'You make arrangements to get drivers for the other two cars,' which I did, I called up Mr. Asher—

"Q. Wait a minute, I am just asking you about the conversation you had with Mr. Myers. Now, was anything said in there about carrying passengers, at the time you had this conversation with Mr. Myers? A. Mr. Myers told me I would have to carry passengers—

"Mr. Touchstone: That is leading and suggestive and also it is hearsay, immaterial and irrelevant and no connection of Myers shown with the company.

"The Court: Overrule the objection.

"Mr. Touchstone: Note our exception.

"Q. Answer the question. A. Mr. Myers told me I would have to carry passengers and chisel the cars through the best I could.

"Q. Did you reach any agreement as to what you were to be paid for carrying these cars?

"Mr. Touchstone: Same objection, same grounds.

"The Court: Overrule the objection.

"Mr. Touchstone: Note our exception.

"A. Yes, sir, he said there would be $30.-00 apiece paid me when the cars arrived at Dallas, that would take care of my wage and transportation back in case there was nothing in Dallas to come back.

"Q. Was there anything said in this conversation as to who was to pay for the gasoline and oil?

"Mr. Touchstone: Same objection, same grounds.

"The Court: Overrule the objection.

"Mr. Touchstone: Note our exception.

"A. I was to carry passengers to pay the expense of the gas and oil.

"Q. If you didn't get any passengers, was anything said or not as to how the oil and gas necessary to bring the cars was to be paid for?

"Mr. Touchstone: Same objection, same grounds, also it is leading and suggestive.

"The Court: Overrule the objection.

"Mr. Touchstone: Note our exception.

"A. I was to be reimbursed in case I couldn't get passengers enough to pay for the transportation of the cars.

"Q. Did Mr. Myers or anybody else advance you any money before you left Los Angeles? A. No, sir.

"Q. Now, did you make arrangements to transport these other two cars? A. I called up Mr. Asher—

"Q. Just answer the question yes or no. A. Yes, sir.

"Q. Were you to drive one of these cars? A. Yes, sir."

It was further shown by the testimony of Morrison that at Phœnix he secured two passengers whom he agreed to carry to Fort Worth for a certain fare. These two passengers were in the car at the time of the accident. At El Paso Morrison came in contact with appellee who desired to go to Big Spring. Morrison agreed to carry him there for $4, which appellee paid. When the three cars were delivered to Morrison to be driven to Dallas, Myers, the representative of the California corporation, gave Morrison a letter which reads:

"1031 S. Broadway
"Los Angeles, Calif.

"August 6th, 1931.
"Mr. Hecox, Commercial Credit Company, 2115 Pacific Avenue, Dallas, Texas.

"Dear Sir: Upon delivery of three cars to your office—Spears Dodge, Owen Cates, Chrysler and Gray Dodge, will you please give Mr. Morrison $90.00 and he pays all of his own expenses, including gas, oil, etc.

"Hoping this is satisfactory to you, and in the event we can assist you at any time in the future, please do not hesitate to call upon us.

"[Signed]  Very truly yours,
"J. B. Myers,
"J. B. Myers,
"Claims Manager."

According to the evidence, viewed from appellee's standpoint, the Gray car driven by Morrison, when it was delivered to Morrison in Los Angeles, had a cracked spring hanger, and this defect had existed for some time. While driving en route from El Paso and a few miles east of the city, the defective spring hanger broke in two parts, causing the front end of the car to suddenly drop and lock the steering gear, resulting in Morrison losing control of the car, which left the pavement and collided with the tree.

We copy from appellee's brief this succinct

statement of the findings made upon special issue submission of the case, viz.:

"1. (a) The spring hanger was cracked at the time the automobile was turned over to Morrison at Los Angeles.

"(b) Such crack made the use of the automobile dangerous.

"2. Appellant did not know of such crack.

"3. Appellant failed to use ordinary care to inspect the car.

"4. Appellant was negligent thereby.

"5. Such negligence was a proximate cause of the accident. ·

"6. By the use of ordinary care appellant would have known of the crack.

"7. The crack was such a defect as would have been revealed by an ordinary inspection.

"8. Appellant was negligent in failing to repair the spring hanger.

"9. Such negligence was a proximate cause of the accident.

"10. Morrison was appellant's employee.

"11. Morrison had authority to carry plaintiff from El Paso to Big Spring.

"12. It was contemplated by appellant that passengers would be carried in the car.

"13. Morrison drove the car at a rate of speed a person of ordinary prudence would have.

"14. Unanswered.

"15. Morrison was driving less than 45 miles per hour.

"16. Unanswered.

"17. Morrison exercised ordinary care to keep a proper lookout.

"18. Unanswered.

"19. Morrison exercised ordinary care with reference to keeping the automobile under control.

"20. Unanswered.

"21. Appellee's injuries were not brought about solely by the negligence of the driver.

"22. Unanswered.

"23. The collision was not an unavoidable accident.

"24. The collision was not caused by new intervening or independent cause.

"25. The collision was not caused in a manner different than that alleged in plaintiff's petition.

"26. Morrison was not an independent contractor.

"27. Appellant was not acting as the agent of Perry Motor Company.

"28. Appellee did not request the driver to reduce the speed of the car.

"29. Appellee was not negligent in so failing.

"30. Appellee's conduct did not result in his injuries.

"31. The paving on the highway was not wet.

"32. Unanswered.

"33. Appellee was not negligent in not warning the driver of the wet pavement.

"34. Morrison was not driving in excess of 45 miles per hour.

"35. Appellee did not negligently acquiesce in the speed in which the car was driven.

"36. Unanswered.

"37. Appellee did not discover the driver was not keeping a lookout prior to the accident and fail to admonish him.

"38. Appellee did not acquiesce in the driver's failure to keep a proper lookout.

"39. Unanswered.

"40. Appellee did not negligently fail to admonish the driver as to the manner in which he was driving.

"41. Unanswered.

"42. Appellee did not negligently fail to leave the car after discovering the manner in which it was driven.

"43. Unanswered.

"44. Morrison was not under the influence of intoxicating liquors.

"45. Unanswered.

"46. Unanswered.

"47. Unanswered.

"48. Appellee did not negligently acquiesce in the manner in which the car was driven.

"49. Unanswered.

"50. Unanswered.

"51. Appellee was damaged as the result of the collision.

"52. His damages were assessed at $12,500.00."

## Opinion.

The first two assignments of error and supporting propositions present the point that the court erred in permitting the witness Morrison to testify to the conversation with Myers and statements of Myers before any competent evidence had been offered to show that Morrison, Myers, or the California corporation were the authorized agents of appellant. It was incumbent upon plaintiff to show that, in driving the car from Los Angeles to Dallas, Morrison acted as the agent or employee of appellant. The contract for such service was made by Myers, claims manager, and representative of the California corporation. In due course of evidence proof of the authority of the California corporation to contract for such service should have been first made before showing the conversation between Myers and Morrison which evidenced the contract of Morrison to drive the car to Dallas.

But the telegrams quoted above establish conclusively that appellant conferred

authority upon the California corporation to contract for the transportation of the car to Dallas. All of the testimony later introduced conclusively shows that Myers, as the representative of the California corporation, did contract with Morrison to drive the car to Dallas. The order in which evidence shall be admitted rests largely within the discretion of the trial court. Gulf, C. & S. F. Ry. Co. v. Holliday, 65 Tex. 512. The case had been previously tried before the same learned judge, and he knew that appellee would be able to conclusively show the authority of the California corporation and its agent, Myers, to contract with Morrison to drive the car to Dallas, and that Myers did so contract. The point presented, therefore, shows no reversible error, in view of the later undisputed proof by appellee showing the contract under which the car was being driven to Dallas by Morrison and the authority of Myers to so contract.

Throughout appellant's brief, it is repeatedly assumed and stated that the only evidence of the agency of the California corporation and Myers to contract with Morrison to drive the car to Dallas is the testimony of Morrison of declarations of Myers in the conversation between them. The telegrams and Myers' testimony all show the authority stated, and there is no evidence to the contrary. This ruling disposes of all theories predicated upon the assumption that there was no competent evidence of the authority of the California corporation and its claims manager, Myers, to contract with Morrison to drive the car to Dallas.

The next group of assignments and propositions complain of the refusal of a peremptory instruction in favor of appellant and also complain of the submission of various issues.

In this connection, it is first argued that the California corporation was the agent of Morrison in negotiating the contract for the transportation of the car to Dallas. This position, it seems, is predicated primarily upon the testimony of Morrison that for about two years prior to August, 1931, he had been in the business of transporting repossessed cars for finance companies, and upon August 5th he approached Myers and asked if he had any cars moving. This is wholly insufficient to sustain the position taken. Morrison was merely seeking employment, and the telegrams and testimony previously stated show plainly that, in contracting for the transportation of the car, the California corporation and Myers acted as the agents of, and for the benefit of, the appellant.

It is also argued the evidence shows as a matter of law that in transporting the car Morrison was an independent contractor. This is untenable, for the evidence shows that in driving the car to Dallas Morrison was performing a service for appellant expressly authorized by it, and the presumption thus arising is that Morrison was in the employ of appellant as an employee. It then devolved upon appellant to show that under the terms of the contract the relation of master and servant did not exist. Taylor B. & H. Ry. Co. v. Warner, 88 Tex. 642, 32 S. W. 868.

The rule in this respect is stated in 23 Tex. Jur. title, Independent Contractors, at § 8, as follows: "A presumption of the relationship of employer and employee—master and servant—arises when it appears that one person is engaged in work for another. Consequently, the burden of proving that there was an independent contract falls upon the party asserting its existence as a defense to liability."

The evidence in this case, as we view it, falls far short of showing as a matter of law the independence of the contract by which Morrison undertook to drive the car to Dallas. In the first place, the character of the service to be performed is antagonistic to the idea that Morrison was an independent contractor. One delivering an automobile to a railroad for transportation by rail necessarily surrenders all control over the details of the transportation, but it is not to be presumed that such control is surrendered by one who delivers an automobile which he owns or has a lien upon to one who is to drive it to a distant point and there deliver it to some designated person. It is not a natural inference to assume that the one who is to drive it is at liberty to run at a rate of speed that would injure the car, use insufficient or inferior oil, or otherwise operate the car in such a manner as to injure it. These are details of the work to be done, and the evidence fails to show such surrender of control as would necessarily render Morrison an independent contractor in undertaking to drive the car from Los Angeles to Dallas. On the contrary, Morrison testified he was instructed by Myers to take the southern route to Dallas, go by Phœnix, and there call on Mr. Thelen, the representative of the Commercial Credit Company of Arizona, "to see whether he had anything coming back from the east or not."

Upon the issue as to the independence of the contract, the court did not err in refusing to withdraw such issue from the jury. Viewed in its aspect most favorable to appellant, the issue was no more than one of fact for the determination of the jury. 23 Tex. Jur. title, Independent Contractor, § 14. J. W. Zempter Const. Co. v. Rodgers (Tex. Civ. App.) 45 S.W.(2d) 763; Texas E. I. Ass'n v. Owen (Tex. Com. App.) 298 S. W. 542.

Various propositions assert that the authority of the California corporation to contract with Morrison to drive the car to Dallas is evidenced by the telegrams above quoted, and such telegrams did not authorize such

corporation to negotiate a contract with Morrison which would impose any liability upon appellant arising out of such contract and transportation. In other words, appellant's position is that such telegrams did not authorize the California corporation to engage the services of Morrison as appellant's employee, but simply authorized the corporation to negotiate a contract whereby Morrison's status would be that of an independent contractor.

Another proposition is to the effect that the letter of August 6th quoted above and given to Morrison by Myers when the car was delivered for transportation evidences the contract between the parties and fixes the status of Morrison as an independent contractor.

The telegrams are not susceptible of the interpretation thus placed upon them. The third telegram advised that the California corporation had a man who would return the Spears and Cates cars for $30 each and advised the cars be returned. The fourth telegram, which was by appellant, authorized the California corporation to send all three cars to Dallas, and the only limitation placed upon the authority thus conferred was that the cost to appellant was to be only $30 for each car and $90 for all three cars.

These telegrams in no wise limited the authority of the California corporation to the negotiation of an independent contract. They broadly conferred authority to negotiate a contract with the unnamed man mentioned in the third telegram to return the cars at a cost to appellant not exceeding $30 per car. Under the authority thus conferred, the California corporation was authorized to negotiate an independent contract or a contract by which the driver would be the employee of appellant.

The appellant contends the telegrams authorized an independent contract only, but it could with equal plausibility be argued they only authorized a contract by which the one proposing to drive the car would do so as the employee of appellant.

As to the letter of August 6th, there is nothing therein which stamps Morrison as an independent contractor. It is wholly silent as to the issue of whether Morrison was an employee or independent contractor.

■■■■For the reasons stated, all assignments and propositions are overruled which in varying forms assert the judgment is unsupported by the evidence, and a peremptory charge in appellant's favor should have been given. We have not undertaken to discuss separately the numerous grounds relied upon by appellant in such connection, as the views expressed, expressly or by implication, dispose of all such alleged grounds of error. Many of such questions we regard as foreign to the controlling issues raised by the pleadings and evidence. Others we regard as predicated upon untenable interpretations of the evidence.

Briefly stated, we hold upon this phase of the case that, under the pleadings, evidence, and facts found by the jury, judgment in plaintiff's favor was properly rendered upon the theory that his injury was sustained through the negligence of appellant, while plaintiff was a paid passenger riding in the car driven by appellant's employee Morrison, who, in accepting plaintiff as a paid passenger, was acting within the scope of his employment.

■■■ Misconduct on the part of the jury is charged. Upon the hearing appellant placed one juror on the stand. His testimony is uncertain and, in some respects, contradictory, and there are circumstances reflected by his testimony which warrant the court in giving but little, if any, weight to the same. Appellee placed one juror on the stand who contradicted the testimony of the other juror upon all the charges except that relating to a discussion of attorney's fees. The matter of attorney's fees was mentioned by one or more of the jurors, but they were promptly admonished by the foreman and another member of the jury that it was not a proper matter for discussion or consideration, and the matter was not further referred to. Neither of the jurors who testified were influenced by the reference to attorney's fees, and there is nothing to indicate the other jurors were. Under such circumstances, the trial court did not abuse the discretion vested in him in holding that the charge relating to discussion of attorney's fees did not show misconduct such as would require a new trial. Bradley v. T. & P. Ry. Co. (Tex. Com. App.) 1 S.W.(2d) 861.

■■■ As to the other charges of misconduct, the testimony, as pointed out, was conflicting, and the court resolved the issue in appellee's favor. The trial court's findings upon such issues are controlling.

■■■ The charge of improper argument by counsel for appellee is made. The qualifications to the bills show that it was in reply to argument by counsel for appellant, who had strongly and harshly attacked appellee because of a previous prison record. We think the argument complained of is not reversible under the circumstances.

Other arguments complained of were legitimate deductions from the testimony, and therefore permissible.

Appellant's brief consists of over two hundred typewritten pages. It contains ninety-two assignments of error and an even greater number of supporting propositions. Lengthy arguments are incorporated in the brief. A reply brief is also filed by appellant.

Numerous assignments are directed against the court's charge and practically all of the issues submitted. They have all been con-

sidered. They are regarded as without merit and calling for no discussion.

There are a number of other assignments which we have not specifically referred to, but they also have received our careful consideration. They relate in the main to matters of procedure and practice. We think they show no error and call for no discussion. To discuss the same would serve no useful purpose, but would unduly and unnecessarily prolong this opinion, already too lengthy.

We regard this case as one of fact. It arises upon a novel state of facts, but presents no novel questions of law. It merely requires the application of well-settled rules of law to the novel facts presented.

Affirmed.

### On Motion for Rehearing.

■ In our original consideration of this case, we assumed the telegrams passing between appellant and the California corporation were introduced in evidence by appellee. In this we were in error. They were introduced by appellant. But it is unimportant by which side the telegrams were offered. They were in evidence for all purposes, and were as available to the plaintiff as if offered in his behalf. Gulf, C. & S. F. Ry. Co. v. Cusenberry, 86 Tex. 525, 26 S. W. 43. It does not affect our ruling that these telegrams and the testimony of Myers established conclusively the authority of the California corporation and Myers to contract with Morrison to transport the car back to Dallas. Such authority being so shown, we adhere to the view that the error in permitting Morrison to testify to the conversation with and statements of Myers prior to proof of such authority is harmless.

■ We also adhere to the ruling that under the authority conferred it was competent for the California corporation and Myers to enter into a contract with Morrison whereby the status of the latter would become that of a servant of appellee. Appellant calls attention to the fact that Morrison could not drive both cars. We do not regard this as conclusively establishing that the California corporation was authorized only to negotiate an independent contract for transportation, or that Morrison's status was in fact that of an independent contractor. In this connection we quote: "Assistants Employed by Servant —Authorization or Ratification by Master. Subject to the limitation that the acts complained of must be within the scope of the servant's employment, a master is liable for the acts of one whom the servant employs under authority given him by the master to assist in the performance of the master's work. The authority to employ assistants may be either express or implied; it may be implied from the nature of the work to be performed, from the general course of conducting the business of the master by the servant, or from the circumstances of the particular case."

Also from 18 R. C. L. p. 785: "If the employee had authority to employ assistants the employer will be deemed liable; otherwise he will not be compelled to respond. Such authority may be implied from the nature of the work to be performed, and also from the general course of conducting the business of the employer by the employee for so long a time that knowledge and consent on the part of the employer may be inferred. It is not necessary that a formal or express employment on behalf of the employer should exist, or that compensation should be paid by or expected from him."

It was but an evidentiary matter upon the issue of whether Morrison was a servant or independent contractor.

■ In the original brief, it is stated Morrison violated the Penal Code of this state in accepting appellee as a passenger for hire; that appellant could not anticipate Morrison would carry passengers for hire in violation of the Texas law; that the California corporation had no authority, express or implied, to negotiate a contract with Morrison that would authorize the latter to violate the Texas penal statutes. In the motion for rehearing these theories are again urged.

Appellant cites and refers to chapter 314, Acts 41st Leg. (1929) p. 698, known as the Motor Carriers' Law, which was violated. That act deals with motor carriers operating "for the purpose of carrying or transporting property for compensation or hire."

Morrison was the mere driver of a privately owned passenger car. He was authorized to drive it. In accepting appellee as a passenger for hire, Morrison certainly did not violate the act cited.

Perhaps the law appellant had in mind is the Act of the 40th Legislature (1927) chap. 270, p. 399, amended by chapter 78, Acts 41st Leg. (1929) p. 196, First Called Session, commonly known as the Motor Bus Law (Vernon's Ann. Civ. St. art. 911a; Vernon's Ann. P. C. art. 1690a). This law relates to persons, corporations, etc., operating motor-propelled passenger vehicles "and engaged in the business of transporting persons for compensation or hire."

Morrison was not engaged in the business of transporting persons for compensation or hire upon the highways of this state. Nor was appellant so engaged. Morrison was simply engaged in the task of driving a passenger car to Dallas to be there delivered to appellant, under a contract so to do. Neither Morrison nor appellant violated either of the laws mentioned in undertaking to transport plaintiff for hire from El Paso to Big Spring. Hoffman v. State (Tex. Cr. App.) 20 S.W.(2d) 1057.

The twelfth issue reads: "Do you find from a preponderance of the evidence that, at the time the automobile in question was delivered to A. E. Morrison, to be driven to Dallas, Texas, it was contemplated by the defendant that passengers would be carried by him therein?"

This was answered "Yes."

In the brief various propositions are leveled against this issue, the use of the word "contemplate" therein, and the finding upon the issue. In the original consideration of this appeal, we were of the opinion these propositions presented no error and called for no discussion. The objections made we regard as hypercritical. But, if not, the finding is immaterial, in view of the eleventh finding that it was within the actual scope of the employment of Morrison to undertake to carry the plaintiff from El Paso to Big Spring.

In the original opinion, the assignments complaining of improper argument by counsel for appellant were overruled with the brief comment that we did not consider the argument reversible under the circumstances. .

The bill shows that Mr. Holliday in the closing argument said:

"The testimony in this case shows that Mr. Groseclose was sent to Cherokee County at sixteen years of age, for which he was pardoned, and later he went to Walker County and was later pardoned. As I reminded you in the beginning of my short and brief remarks, the purpose of society is to reform men. This man came out here and left the past behind him, married a beautiful young woman, has a wife and child, has led a clean and industrious and useful life. Granted, for the argument, that they brought it in here to show the reduced earning capacity, but, after, gentlemen, he came back before you and admitted he was away and wasn't making any money during that period, was there any necessity, in all fairness and all justice, for them to come in here and try to further spread the slanders against this man's past—

"Mr. Touchstone: We object and take a bill of exceptions, it is improper, inflammatory and prejudicial.

"Mr. Holliday: I remember that great novel of Victor Hugo's, where Jean Valjean stole some bread for his family—

"Mr. Touchstone: We take a bill of exceptions.

"Mr. Holliday: And that he was sent to the penitentiary.

"Mr. Touchstone: It is out of the record, prejudicial and inflammatory.

"Mr. Holliday: And that he later got out or escaped and was again sent to the penitentiary for stealing candles from the priest, there was the testimony of the priest that he gave them to him, but he was sent again to prison and escaped and served a useful and philanthropic life, and until God took him back into his bosom, he was hounded throughout the earth. I am reminded of O. Henry, that great Texas writer, who served a term in the penitentiary.

"Mr. Touchstone: We object and except to anything about O. Henry as out of record, inflammatory and prejudicial.

"Mr. Holliday: What has that to do with this case? The penitentiary was long behind Mr. Groseclose. It served no purpose except their purpose in this case, it had nothing to do with the fact that he had lived in your community, married one of your girls, and raised a beautiful little child and performed all and every duty, and yet that was brought in here for only one purpose and that is to try and raise the passion and prejudice of this jury against this man, when it has nothing to do with this accident. Do you think that is fair? All right, I don't."

This qualification is appended to the bill:

"Mr. Brown, counsel for defendant, in the opening argument for the defendant, discussed the question of the veracity of the plaintiff and said that there was an old rule, which was entitled to consideration in a matter of this sort, which was established as far back as the days of the ancient Latins, to the effect that where a witness's testimony was false in one particular, it was false in all; further, in the argument he quoted from Gibbon's 'Roman Empire,' in which he said that loud speaking was not argument, and referred to that class of lawyers of whom Gibbon said 'they filled the forum with their turgid eloquence.' And Mr. Brown, at two or three other times in his argument, while speaking of matters in the record, mentioned the sayings of famous men to elucidate the points that he was making; and, also, Mr. Brown, in reference to plaintiff, further said in his argument: 'Gentlemen of the jury, ever since this trial first began, this defendant has been looking down a legal gun barrel, and this isn't the first time that plaintiff has had someone looking down a gun barrel.'

"And attorney Touchstone, in the closing argument for defendant, argued that plaintiff would not have admitted his prison record unless defendant had brought the record to prove it on him, that he had concealed it twice before, and that the plaintiff tries to excuse himself on the ground that he did not want his wife to know of his sentence, and this record shows that he was married at the time that he served in the penitentiary, whereupon, he read the prison record admitted in evidence. Mr. Touchstone, also, in his argument, stated to the jury that it was an unpleasant task to expose plaintiff's prison record, that the plaintiff himself made the record, and that the courts admitted evidence of the matters to be considered by the jury on the credibility of the witness and on his earning capacity, and that the lawyers were com-

pelled to show the record in duty to their clients; and while this plaintiff would have you believe he was making as high as $14.00 a day as an oil driller, as a matter of fact, he was working for the State of Texas for nothing."

We stated in the original opinion counsel for appellant had strongly and harshly attacked appellee because of a previous prison record. The qualification of the bill shows that Mr. Brown had so attacked the plaintiff. This statement implies no criticism of Mr. Brown. The evidence justified the attack so made. Mr. Touchstone, in a proper manner, had also commented upon such prison record. Mr. Brown, in attacking plaintiff's veracity, also referred to a rule of the ancient Latins, quoted Gibbon's comment on loud speaking and turgid eloquence, and mentioned the sayings of famous men.

The plaintiff's counsel had the right to reply in kind to the argument and minimize, if he properly could, the damaging effect of such argument, and the evidence upon which it was based. In view of the argument to which he was replying, we think the matter presents no reversible error.

■ Mr. Moore, counsel for appellee, said:

"They say well, anything you say, it doesn't make any difference, those telegrams here are all of the correspondence in regard to this transaction and they demonstrate that at no time was this man employed or authorized to carry passengers or anything of the kind. Now, is that so? All right, we will see whether that is so. We will take their last telegram, if I can find it. They first say 'have man to return both for thirty dollars each better return them,' they say. Now, to the Commercial Credit Company, Los Angeles, from the Dallas office, 'If your wire regarding Walter Spears and Owen Cates means you can get cars to Dallas for thirty dollars apiece with no other expenses added send them back also send the Gray car back Stop We understand ninety dollars is all expense involved in getting three cars to Dallas advise.' Now, they would read that to you and say that shows clearly that this man was not authorized to allow these cars to go through on any other proposition except $30.00. Well, now, what about the last word on this telegram 'advise', have they brought before you any telegram advising? Where is the telegram in answer to that telegram, there must have been one, it asks for an answer? That was sent on the 5th of August, the cars didn't go out until the 6th. If that settled it, why didn't the cars go out on the 5th? They probably sent an answer to the telegram, but they don't want to bring that answer in here."

"To this remark Mr. Touchstone, one of the attorneys for the defendant, said 'We object to that as outside of the record, no evidence to support that,' whereupon Mr. Moore replied:

"'That is the inference you have the right to draw. That telegram calls for an answer, there has no answer been brought here. Why not? How do we know they didn't make any answer to that telegram to this effect: 'Passengers will be carried in the automobile which will cover the expenses.'

"The Court: Mr. Moore, I think you are out of the record.

"Mr. Moore: I think that is a logical inference, if the Court please.

"Mr. Brown: The witnesses say that is all of the correspondence.

"Mr. Holliday: Judge Moore stated that in his argument, that is what they said.

"Mr. Moore: What is the Court's ruling?

"The Court: Yes, I will withdraw the argument.

"Mr. Moore: All right, the Court rules that argument is not proper and I join in asking the jury not to consider it. I don't want to make any argument here that is not strictly proper in every respect."

The last telegram did request a reply, and why none was sent is unexplained.

Mr. Moore's argument was a legitimate inference, and he had a right to make it.

■ The bill shows further:

"Mr. Holliday: Now, then, if we are right and you believe under the evidence we are right, that the cause of this collision was a defective hanger, weak back or strong back, the bones are separated, as Dr. Stevens told you, into two parts, I don't know whether you call it separation or break, they are separated in fact, it looks like to me I could put my finger in it, it may be, God only knows, that they broke it, and if he had a weakened back, no doubt it will gradually separate.

"Mr. Touchstone: We take exception about broke his back as prejudicial and inflammatory.

"And later in the closing argument of Mr. Holliday, the following occurred:

"Mr. Holliday: And I say, gentlemen, under the evidence in this case, that spring hanger left Los Angeles defective, they gave us the defective machine, took our money to ride and broke our back and they ought to pay for it.

"Mr. Touchstone: We take a bill to broke our back, it is out of the record, inflammatory, prejudicial and improper.

"Mr. Holliday: If it suits better, instead of broke our back, I will say they separated our back. What is the difference? It is useless, just the same."

Dr. B. F. Stevens, witness for defendant, testified he found no evidence of a fracture of the fifth lumbar of plaintiff's backbone, but plaintiff was not bound to accept Dr. Stevens'

testimony that there was no evidence of a fracture in view of the testimony of Dr. Herbert Stevenson, witness for plaintiff, who testified:

"The posterior portion of the fifth lumbar vertebra is not well shown because it is more or less a conglomerate mass here, it is not well shown in this picture. There is, in my opinion, a fracture at that point, which allowed the bone to be shunted or dislocated forward. The other pictures we have recently taken will show that much clearer than this picture shows it. * * *

"It is also compressed to a great degree, allowing the back to fall upon the pelvis, that causes a certain deformity in the back that is very apparent in this case, you can put a big pocket knife—you can put your whole thumb, fully that length, in the interspace, due to the shunting forward of that vertebra. * * *

"There is more or less jumbling at this point, you see it is so clear these other points, showing there must have been a fracture in here to have allowed this to be displaced as far as it is. This jumbling shows, also, the creation of callous there that is following a fracture. * * * ·

"This picture is, I think, quite a little clearer, it shows the lumbar vertebra distinctly, especially at its posterior end; it also shows the fracture through the lanima a little more clearly, there it is right through there; it shows irregularity a little more distinctly in this picture than in the other, that compression fracture of the body of the vertebra. * * *"

This testimony of Dr. Stevenson warranted Mr. Holliday in referring to plaintiff's injury as a broken back.

The motion for rehearing is overruled.